ROBERT E. BOYCE
State Bar No. 79806
email: rb@boyce-schaefer.com
LAURA G. SCHAEFER
State Bar No. 138801
email: ls@boyce-schaefer.com
BOYCE & SCHAEFER
Attorneys at Law
934 23rd Street
San Diego, CA 92102
619/232-3320

Attorneys for Defendant
DAVID LAUSMAN (6)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

(Honorable Janis L. Sammartino)

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17CR0623-JLS-6 |
| Plaintiff, | **DEFENDANT LAUSMAN'S MOTION TO PRECLUDE PRESENTATION OF FALSE AND IRRELEVANT EVIDENCE AND REQUEST FOR AN EVIDENTIARY HEARING RE *BRADY* VIOLATION** |
| v. | |
| DAVID NEWLAND, et.al. | |
| DAVID LAUSMAN, (6) | |
| Defendant. | |

Defendant, David Lausman, by his counsel, Laura Schaefer and Robert E. Boyce, moves to preclude the presentation of false and irrelevant evidence regarding Mr. Lausman's alleged participation in prostitution and requests an evidentiary hearing regarding the government's *Brady*[1] violation.

**I.    Introduction**.

The government alleges that Mr. Lausman received the services of a tall prostitute named "Ina" at Mr. Francis' expense in May 2008 at

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

the Makati Shangri-La. In late February 2022, a defense investigator interviewed this woman Ynah[2], who now lives in the Philippines. Ynah denied having sex with Mr. Lausman, but stated that, at her request, he allowed her to go to his room where she slept on the couch and he slept on the bed; there was no disrobing or sexual activity of any kind. He was a polite gentleman, tried to leave the presidential suite "party" early without her and did not want to participate in any festivities.

Mr. Lausman's investigator was informed by Ynah that Agents Oscar Cunha and Jill Dempski interviewed Ynah on March 8, and she provided the same information to the agents. She also told the agents and the defense investigator she did not want to travel to the United States. No report of this March 8 interview has been provided to the defense; the defense only has reports of the attempts to contact Ynah, ending on March 3.

The government intends to introduce Steve Shedd's testimony that Mr. Lausman left the presidential suite party with Ynah, where she spent the night at his hotel room, and that, the next morning, Mr. Lausman denied having sex with Ynah. The government intends to characterize Mr. Lausman statements as "self-serving" and untrue, and through Mr. Shedd, will attempt to create a scenario it knows is false.

First, the government should not be permitted to present this evidence to create a false scenario; given the true state of affairs, Mr. Shedd's testimony should be excluded under Rule 402 and 403 as irrelevant and prejudicial. Second, the government has suppressed exculpatory evidence in violation of its *Brady* obligations. An evidentiary hearing is required to allow Mr. Lausman to develop the

---

[2] "Ynah" is the proper spelling for the woman's nickname in the Philippine language, not "Ina."

facts needed to support his claim and seek an appropriate remedy.

## II.  Factual and Procedural Background.

### A.  The prostitution allegations and opening statement.

In opening statement, the government asserted that Mr. Lausman accepted a bribe of a prostitute in Manila in 2008, stating that "Defendant's Lausman's wife Carol didn't come to Manila, and so defendant Lausman partied along with the rest of the members of the conspiracy . . . and in Manila he accepted a prostitute from Leonard Francis as well. Remember Francis always comes calling." Govt. Opening Statement, March 2, 2022, p. 31, attached as Exhibit A. Specifically, the government asserts that Mr. Francis brought Ms. Tabancura[3], also known as "Ynah," to the Presidential Suite of the Makati Shangri-La where she provided prostitution services to Mr. Lausman at Mr. Francis' expense.

### B.  Investigator Efren Lapuz interviews Ynah on February 22, 2022.

On February 22, 2022, Mr. Lausman's investigator, Efren Lapuz, located Ynah in the Philippines and contacted her by telephone. She told Mr. Lapuz that Mr. Francis recruited her and several other women to entertain visiting "friends" from abroad at parties, and paid them 10 to 15,000 in Philippine currency (about $200 to $300 US dollars) to share food and drinks and keep the visiting friends company. Attached as Exhibit B are Mr. Lapuz's notes regarding his contact with Ynah. According to Ynah, customarily most women only stayed for the party, but some would spend the night with a guest for an extra payment. There was never a feeling that sex with a guest was "forced", and she had sex with a few of the men because "they were cute."

---

[3]  Ms. Tabancura will be referred to by "Ynah."

Ynah recalled that one night in 2008, she was introduced to a tall thin Caucasian male referred to as "Too Tall." Mr. Francis told her to keep him company, to include sleeping with him. Ynah said the tall man was quiet and boring and didn't drink much; she said he was "not a party guy." He told Ynah that he wanted to leave because he was tired. When asked if he said "you do not have to come with me," she said he was "mahinhin," meaning polite with manners. As he walked out, she told him she had to stay with him or she would not get paid.

The tall man said he understood and they went to his room. Ynah said there was no physical contact between them. There was no touching, no disrobing and no sexual activity. He slept in the only bed and she slept on the couch.

Ynah has raised a family and wants to put the past behind her. she was adamant in her refusal to travel to the United States to testify because she feared Mr. Francis, who is a powerful man well-connected in Asia with contacts with Philippine government officials. Mr. Lapuz advised that Mr. Francis was on house arrest in San Diego, but she believes he still wields significant power in Asia and probably has money hidden there.

C. <u>Agents Oscar Cunha and Jill Dempski's March 8, 2022 interview of Ynah</u>.

On March 8, 2022, six days after the government delivered opening statement accusing Mr. Lausman of accepting the services of a prostitute, agents who identified themselves to Ynah as "Oscar" and "Jill" interviewed her. DCIS agent Oscar Cunha and NCIS agent Jill Dempski are agents who have substantially participated in the investigation of this case.

Ynah then contacted Mr. Lapuz by text message, and told him that she received a call from the agents "Oscar and Jill," they asked her

if she could testify and she responded "no." They asked if she talked to anyone else and she responded yes, without naming Mr. Lapuz; they did not ask who she spoke with. Attached as Exhibit C is Mr. Lapuz's email to counsel for Mr. Lausman dated March 8, 2022, relating Mr. Lapuz's conversation with Ynah regarding the agents' interview. The agents asked her what questions were asked and she told them she was asked if she had sex with a tall guy, that she responded she did not, and that she told the agents what she had previously told Mr. Lapuz. The agents indicated they were reaching out to her because they did not trust Mr. Francis's word.

### D. The prosecution's withholding of the March 8 exculpatory interview of Ynah.

Mr. Lapuz, a former federal agent who understands the obligation to turn over exculpatory information possessed by the prosecution team, advised Mr. Lausman's counsel that he was "certain an interview report will be generated by Oscar Cunha." Exhibit C. No report was ever produced.

Instead, on April 12, 2022, over a month after the agents' contact with Ynah, the government provided Mr. Lausman with a report dated April 5, 2022, detailing the NCIS investigative efforts ranging from February 9, 2022 through March 24, 2022. Attached as Exhibit D is a copy of this report.

A portion of the report (Exhibit 1794) details the efforts of the Philippine Special Agent Michael Kim's efforts to locate and interview Ynah. The report states that Ynah contacted Agent Kim and agreed to receive a call from a case agent at her mobile number (redacted). The report did not contain any reference to the agents' subsequent interview of Ynah. The government has not turned over to the defense any report of Agents' Cunha and Dempski's interview of Ynah.

> E. <u>Mr. Boyce's efforts to preclude reference to Ynah and the prosecution's continued intent to present a false scenario to Mr. Lausman's jury</u>.

In a proffer interview dated January 6, 2022, Mr. Steve Shedd reported that he recalled Mr. Francis "pairing" Mr Lausman with a "taller prostitute" named Ina, that Mr. Lausman stayed in a room with this woman, and that Mr. Lausman "vigorously denied that anything (sexual) had occurred with Ina." Attached as Exhibit E are the relevant excerpts of Mr. Shedd's interview regarding this event. (Pages 6 and 12.)

On April 15, 2022, counsel for Mr. Lausman emailed Mr. Pletcher, and stated that, in light of Mr. Shedd's statement that Mr. Lausman denied having a prostitute that night at the Makati, Mr. Shedd's testimony regarding seeing Mr. Lausman leave the Presidential Suite with Ina would not be relevant under Rule 402, and would be more prejudicial than probative under Rule 403. He requested that Mr. Pletcher agree not to introduce Shedd's testimony on this subject.

On April 18, Mr. Pletcher responded as follows, "I don't think you've set forth the facts accurately, but as I understand the incident you reference, you recount Mr. Lausman's self-serving statements the next morning, after spending the evening in a hotel room at the Shangri-La with a woman provided by Mr. Francis, which no one who heard them believed." Mr. Pletcher offered to enter into "some sort of stipulation of testimony" if "that middle ground has any appeal." Mr. Pletcher did not mention the agents' interview of Ynah. Attached as Exhibit F is a copy of this email exchange between Mr. Pletcher and Mr. Boyce.

It has now been nearly six weeks since the agents' interview of Ynah, and no report of this contact has been provided to the defense.

### III. The prosecution should not be permitted to create a false scenario that implies that Mr. Lausman received the services of a prostitute at Mr. Francis' expense. Mr. Shedd's testimony should be excluded as irrelevant and prejudicial under Rules 402 and 403.

    A. <u>The prosecution should not be permitted to create a false impression of the evidence when the defense has no ability to counter the falsity.</u>

The knowing presentation of false testimony is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan,* 294 U.S. 103, 112 (1935); *Napue v. Illinois,* 360 U.S. 264 (1959). The Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution "protects defendants against the knowing use of any false evidence by the state, whether it be by document, testimony, or any other form of admissible evidence." (*Hayes v. Brown,* 399 F.3d 972, 981 (9th Cir. 2005) (en banc); *Donnelly v. DeChristoforo* 416 U.S. 637, 646 (1974) [due process "cannot tolerate" convictions based on false evidence]. This Due Process right even extends to situations in which the prosecution allows a witness to give a false impression of the evidence. *Alcorta v. Texas,* 355 U.S. 28, 31 (1957) (Outright falsity need not be shown if the testimony taken as a whole gave the jury a false impression).

A prosecutor's function "is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial." *United States v. Kattar,* 840 F.2d 118, 127 (1st Cir. 1988). His or her goal must be "not simply to obtain a conviction, but to obtain a fair conviction." *Brown v. Borg,* 951 F.2d 1011, 1015 (9th Cir. 1991) italics omitted. The prosecution has a "freestanding ethical and constitutional obligation" "as a representative of the government to protect the integrity of the court and the criminal justice system." *N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1122 (9th Cir. 2001); see also *Belmontes v. Brown*, 414

F.3d 1094, 1115 (9th Cir. 2005), rev'd on other grounds sub nom., *Ayers v. Belmontes*, 549 U.S. 7 ("Whether defense counsel is aware of the falsity of the statement is beside the point"); *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000).

The prosecution seeks to introduce Mr. Shedd's testimony to prove that Mr. Lausman accepted the services of a prostitute from Mr. Francis as a bribe, notwithstanding that the prosecution is in possession of very reliable information from the source, Ynah, that establishes that Mr. Lausman did not accept the services of a prostitute. Mr. Lausman's statements, which the government characterizes as false and "self-serving," are the truth. But the government has no interest in the truth; it wants a conviction, at any cost.

The prosecution seeks to introduce Mr. Shedd's testimony to present a false scenario to this jury, with full knowledge that Mr. Lausman will be unable to establish its falsity because Ynah, a foreign national, cannot be subpoenaed by the defense and refuses to travel to the United States and testify. Apparently, the government knowingly intends to take full advantage of Ynah's refusal to testify to perpetuate a false allegation that Mr. Lausman is powerless to dispel, all in violation of Mr. Lausman's right of Due Process.

Given that Ynah has confirmed that she did not have sex with Mr. Lausman, Mr. Shedd's testimony that Mr. Lausman was "paired" with a "taller prostitute" and spent the night with her in a hotel room is irrelevant, highly prejudicial and sets up a false scenario. Mr. Shedd's testimony regarding Mr. Francis providing Mr. Lausman with a prostitute should be excluded under Rules 402 and 403.

### IV. Mr. Lausman requests an evidentiary hearing regarding the government's failure to produce exculpatory evidence in violation of *Brady v. Maryland*.

*Brady v. Maryland* and its progeny requires disclosure of evidence that is favorable to the accused and "material either to guilt or to punishment." 373 U.S. at 87. "Suppression by the prosecution, whether willful or inadvertent, of evidence favorable to the accused and material to either guilt or punishment violates the Constitution." *Edwards v. Ayers*, 542 F.3d 759, 768 (9th Cir. 2008). The term "suppression" does not describe merely overt or purposeful acts on the part of the prosecutor; sins of omission are equally within *Brady*'s scope. See *Benn v. Lambert*, 283 F.3d 1040, 1053 (9th Cir. 2002) ("[T]he terms 'suppression,' 'withholding,' and 'failure to disclose' have the same meaning for Brady purposes.").

The Supreme Court has clearly held that "Brady suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438). "[E]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands until the agency decided the prosecutor ought to have it . . . ." *United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004) (quoting *United States v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995). "The prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. Because the prosecution is in a unique position to obtain information known to other agents of the

government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997) (en banc) (citations omitted).

Exculpatory material does not need to negate an offense element to qualify as *Brady* because it applies to all favorable material relevant to guilt or punishment. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (applying *Brady* to impeachment); *Kyles v. Whitley*, 514 U.S. at 420 (*Brady* applied to evidence that allows "the defense to attack the thoroughness and even the good faith of the investigation.")

Ynah's statements that 1) Mr. Lausman did not want to participate in the evening festivities, and 2) that Mr. Lausman did not engage in sexual activity with a prostitute are clearly exculpatory in the context of this case, because the government alleges Mr. Lausman attended a "raging multi-day party" where he and his "conspirators" drank "all of the Dom Perignon available at the Shangri-La" and enjoyed the services of a "rotating carousel of prostitutes." Dkt.# 1, pp. 43-44. These activities are overt acts and "quids" in the alleged bribery conspiracy. Ibid. These also happen to be the most salacious of the allegations in the indictment.

The government apparently had no intention of producing a report of the agents' contact with Ynah. It produced a report on April 12, dated April 5, that purported to include the contacts the government had with Ynah and the results of NCIS investigations up until March 24. Yet it failed to mention Agent Cunha's March 8 interview of Ynah, a witness with relevant information bearing directly on Mr. Lausman's innocence.

The government's withholding of this evidence is particularly disturbing in the unique context of this case, which involve many foreign nationals beyond the reach of ordinary citizens like Mr. Lausman. Unlike the prosecution, the defense does not have an army of NCIS agents on the ground in Southeast Asia to locate and interview witnesses who might provide exculpatory information for the defense.

For example, Mr. Lausman has presented evidence that Mr. Francis and his assistant Marilyn Asensi with the help of a person named "Gin" employed at the Shangri-La in Singapore secretly upgraded Mrs. Lausman's room. These upgrades are alleged as "quids" in the indictment. The government has produced no reports from Ms. Asensi and no reports of any effort to locate "Gin." Rosemary Chng is another individual alleged to have provided Mr. Lausman with a golf game; there are no reports of any interviews with Ms. Chng. The defense is in a position to have to trust that the government and its agents are producing exculpatory evidence and not presenting evidence that creates a false scenario. It has become painfully obvious that this trust was misplaced.

Mr. Lausman should be permitted to develop his claim that the government has violated *Brady*. He should be able to use the government's withholding of this evidence to attack the thoroughness and, indeed, the questionable "good faith" of the government agents' investigation in this case. *Kyles v. Whitley*, 514 U.S. at 420. For these reasons, Mr. Lausman requests an evidentiary hearing to develop the factual basis for his claim, and to assist in seeking an appropriate remedy from this Court.

## V. Conclusion

Mr. Lausman requests this Court exclude Mr. Shedd's testimony regarding Mr. Lausman's receipt of a prostitute from Mr. Francis at the Makati in May 2008. Given the true state of affairs, this evidence is irrelevant and creates a false scenario.  Mr. Lausman also requests that this Court conduct an evidentiary hearing into the government's suppression of exculpatory evidence in violation of its *Brady* obligations.

Respectfully submitted,

Dated: April 20, 2022

/s/ Laura Schaefer
Counsel for David Lausman